May it please the Court. Good morning. Joshua Bacharach representing the appellant in this case, Reliance Standard Life Insurance Company. I'd like to reserve five minutes for rebuttal. This is an appeal from a District Court decision in favor of the plaintiff on a risk of disability benefit claim. In ruling in the plaintiff's favor, the District Court committed at least two significant errors in the law. The first, the Court applied the treating physician rule, giving deference to the plaintiff's treating physician. And that's wrong because two weeks earlier, the Supreme Court of the United States said that rule does not apply in arrested cases. The problems were compounded. This policy contains a specific grant of discretionary authority to Reliance Standard. It says... So let me ask you something. If the District Court decided this whole thing using the wrong standard of review... Yes. If that's true, and if we accept that position, should we just say, wrong standard of review, District Court's the clearinghouse, send it back to the District Court and say, Judge, apply the right standard of review, and then we'll worry about this case? No, and I'll explain why, Your Honor. In the recent Ninth Circuit decision in Jordan v. Northrop Grumman, the case site on that is 370F3869, the Ninth Circuit looked at this arbitrary and capricious standard of review. And it didn't change the law, but it clarified things a bit more. And it said that when the plan grants discretion, it is that claim administrator's judgment that must be followed. And the key part that I find in that Court's decision is this. The Court said as long as reasonable people can differ on the question of whether the claimant is totally disabled, that decision is not arbitrary and capricious. Now let's look at what the District Court here said. I think you misunderstood. What I said was, should we have the District Court decide this first? I understand what we say the standard is. Your Honor, the point that I was leading to is this. The Court already reached that decision that the decision of reliance standard was at least reasonable. The Court said on page 12 of its original decision denying the summary judgment motions, this is the record excerpts page 12, such evidence as Dr. Goldstein's report could justify a reasonable trier of fact concluding that wary's activities of occasional travel and animal refuge work shows that she's physically capable of working. So the Court's already reached that decision and said that a reasonable person could agree with reliance standard's decision. It's only when the Court applied the wrong standard of review and then applied the treating physician rule that the Court arrived at the wrong conclusion. And as I said, since the Court's already reached the decision that a reasonable person would agree with reliance standard, there's nothing really to remand. This case should be reversed and judgment entered for reliance standard. If the Court would like, I can go into the issue on why the Court was wrong in finding de novo review, but I think it's apparent. This plan grants discretionary authority. Plaintiff's counsel, he succeeded in confusing the District Court. He said, well, look, here's a case that the Ninth Circuit decided earlier called Sandy in which the Court said this That's right, but that's not the language we're relying on. Subsequent plans contain a specific grant of discretionary authority that reliance has the discretionary authority to interpret the plan and determine eligibility. That's the language we rely on. It simply makes no sense that you look to what language does not grant discretion instead of what language does. The District Court here said, why don't you just remove that language from your plan? Well, first of all, why? There's nothing wrong with that ensuring clause language regarding satisfactory proof. More importantly, we can't. Ensuring clause language is the same as incontestability language. A lot of states require us to have it in our policy, so we can't just remove that language from a policy as the District Court stated. Now, as I said, the Court's already determined that a reasonable finder of fact could agree. But what state requires this? For as an example? I'm sorry? For an example, which state requires this language? Which one state? My understanding is trying to recall which ones. I know I've seen them in the two qualifiers. Now, my understanding and I'm trying to recall. You don't know, right? I can provide that to the Court because I know that I've seen this in insurance regulations. I've seen this language. The same as, you know, when we had a few years ago in the Ninth Circuit, we had this. I'm just saying you are saying, if I understand it correctly, if you remove this language, you would then violate the law in some other state. Right. That's what you're representing to us. Yes. You would be violating the law that some specific language is not just permissible in other states, but it's actually required. But it's not. I'm trying to understand what you're trying to tell us. Okay. That's what I heard you saying. If we remove the language, we'd be committing a crime or infraction or transgression or violation of the law of another state. That's what I hear you saying. If you're saying something else, you should make that clear. I can't remember which state, but you will provide me that eventually. But I just want to understand what it is you're saying about the law of other states. Well, my point, Your Honor, essentially is this. It doesn't matter. Because it doesn't matter that there's this language that the Ninth Circuit. Are you withdrawing that argument? You just made an argument. You said the district court said we could just remove the language. And you said, you stood there, we'll play back the tape. I know I did, Your Honor. You said we can't remove the language because we'd be violating the law in another state. And I asked you what state. You said, I don't remember. So I then said, well, I just want to make sure that I understand what you're telling me about other states. You remove that language, you would be violating the law in some other state. And this is when you started backtracking. So are you standing by your statement? Yes, I am, Your Honor. Repeat it now in plain English, just so we have it on the record. That there are languages, there are certain requirements in states, regulations. Well, you're talking specifically about the words. Okay. And that their insuring clauses are required in a number of states' regulations. No, you were talking about the language discretion. What was that? The satisfactory proof language. Satisfactory proof language. That's what you were talking about. You said, so tell me once again what it is you're saying. You removed that language, and what would happen? Your Honor, what I'm saying is that's part of the insuring clause. No, but the district court said, why don't you remove the satisfactory proof language? You said, we can't remove it because, fill in the blank, because we can't remove it. There are state regulations that say that you have to have an insuring clause within a policy. You have to have that, but you said more. You said that you have to have, or that you have to have an insuring clause. And that's quite different from what you argued, which was that you have to have the submitted, you know, the other language. What is it again? The satisfactory proof. Satisfactory proof. Thank you. I don't know why it's not rolling off my tongue this morning. That's quite all right, Your Honor. That's what you said. That's what I heard you say. If I'm misheard, then I'm glad you corrected me. So you do not now claim that you have to have satisfactory proof language, that removing that language would violate the law in any State. You are claiming that claim, right? I am claiming that the insuring clause, which is a part of the money. Are you making that claim or not making that claim? The specific satisfactory proof to us? No. That specific? No. Okay. So when the district court says why don't you remove the satisfactory proof clause, your answer is because it can no longer be because we're going to be violating the law in some other State. You must now give me another reason. You could do it. You would not be violating the law in another State. But the fact of the matter is. Tell me why you're not doing it. Why do we need to? Why do we need to judge? You made the argument. You said let me answer this argument that the district court made. The district court said why don't you remove the clause. Let me tell you why the district court was wrong in asking that question. You stood there and made the argument. I was wrong in that argument altogether? No. And I'll tell you why the district court was wrong. That's the true question. Why is the district court wrong? Because this circuit has said consistently you look to whether the language in the plan grants discretion. The Supreme Court of the United States, Firestone v. Brook, has said you look to whether the language in the plan grants discretion. This policy states. That's perfectly fine. But that's not what you were arguing. What you were arguing is that the district court's point. Look, you could make this language clear. You could avoid this problem by making this language clear by removing certain phrases. That option is not open to you. You wanted to sort of make that argument. And, in fact, if you can make language clear and you don't, then that's something that counts against you if you're free to do it. Your Honor. Yet you leave ambiguous language on the table and that counts against you under the doctrine of counter-preferendum and all that. There is nothing ambiguous in this policy's grant of discretionary authority. I can't make that point any clearer. Reliant Standard Life Insurance Company. Perfectly fine. Let's look at it then. Reliant. This is on page. So what you're saying is we wouldn't change it because it's as clear as it could be. You don't change it because there's no need to change it. It couldn't be clearer. Let me clarify the point. That is the insuring clause. That is what determines whether a claimant gets disability benefits. That is not the discretionary language clause. That's not the authority clause. The authority clause is contained on page 4.0 of the policy. That's page 52 of the record excerpts. And it states unambiguously, unequivocally, Reliant Standard Life Insurance Company shall serve as the claims review fiduciary with respect to the insurance policy and the plan. The claims review fiduciary has the discretionary authority to interpret the plan and the insurance policy and to determine eligibility for benefits. Counsel, are you trying to say something like we have discretion to decide whether the proof was satisfactory? They're two separate issues. I'm not asking two separate issues. Obviously the person has to supply satisfactory proof under the policy. Yes. Are you trying to say, but we have discretion to decide the question of whether this amount of proof was satisfactory or not. Is that what you're saying? Essentially, yes. The insuring clause says. Why don't you just say it and. I apologize. And stop going off on statutory requirements. I apologize for confusing the issue. The benefit provision says that we will pay a monthly benefit if the following factors are met. The question is whether Reliant Standards decision is arbitrary and capricious. Does it have discretion to make that decision? And based on the language in this policy, it does have that discretion. Because the policy states it has the discretionary authority. Well, that's the whole question, is it? Whether or not it does have discretion and authority. Whether it has given itself discretionary authority. And let's go back and look at the language one more time that you claim gives a discretionary authority. Yes, Your Honor. Which clause is it and what does it say? It's on record excerpt page 52. And under payment of claims, Reliant Standard Life Insurance Company shall serve as the claims review fiduciary with respect to the policy and the plan. The insurance policy. Yes. The insurance policy and the plan. Don't skip any words. Yes, sir. Continuing the claims review fiduciary. Have you gotten to that language yet? Yes. Right here. The claims review fiduciary. How many of the language you just read is that? You're now getting into it. Well, Your Honor, the reason being. I'm asking. I'll explain, Your Honor. The reason being that a claims review, if we're not a fiduciary, we can't have discretionary authority under the ERISA statute. Only fiduciaries can have discretion. So the point is, this says, first of all, yes, we are a fiduciary. And then it continues. The claims review fiduciary has the discretionary authority to interpret the plan and the insurance policy and to determine eligibility for benefits. Okay. In a number of cases. Where does it say that that's final authority? Decisions by the claims review fiduciary shall be complete, final, and binding on all parties. That's the continuation of it. But when it specifically says that we have the discretionary authority, this circuit has held we have the discretionary authority. And there was a Sandy? The Sandy case didn't have this language, Your Honor. This language, this authority language, wasn't in that policy. This was placed in policies subsequent to that, not subsequent to that decision, but subsequent to the issuance of the policy in Sandy. Sandy only had the satisfactory proof of total disability to us language in it. And the Ninth Circuit, reversing the Snow v. Standard case, said that doesn't cut it. And so what you saw is a flurry of new policies being issued, which has specific grants of discretionary authority. And this is one. So you can't say, well, this language is already deemed not to be appropriate because this language wasn't addressed in Sandy. It was addressed, and we cited in our brief, in a number of subsequent cases, language just like this the Ninth Circuit has said is acceptable. It grants discretionary authority. So we have the discretionary authority. In our brief, we cite to the evidence that we believe supports our position, and at least shows it's a reasonable decision, the fact that her symptoms are no longer present, the fact that she's not having angina. More important, we show a stress test that shows that she hasn't had stress-induced ischemia, that she doesn't have any angina during exertion. And we're provided with nothing in return that shows that she's suffering from an actual disability. Her own doctors say, well, the stress issue. Maybe she's disabled because possibly she'll suffer from problems due to stress. But we've cited in our brief to a number of cases that said the possibility of future harm isn't a present disability. And in the Jordan case, this Court said that with discretionary authority, it is not arbitrary and capricious to require objective proof of a present disability. She had a heart attack, right? She did. And essentially what we have to defer to is what you're asking us if we review for abuse of discretion. We have to find that she could pick up where she left off, that having had the heart attack and having lost recovery, whatever, she can get back on planes and trains and automobiles and that she can run this operation over this large regional territory. Well, Your Honor, we know she can get back. Isn't that what we're talking about? Not necessarily. First of all, we know she can get back on planes because she did it for personal pleasure. She went to Florida. She went to Arizona. And that was a big part of her thing, her disability claim, saying she couldn't do it. And yet when she's claiming disability, she's doing it. Travel the same way. You travel the same way in business as you do when you travel for leisure or for family purposes? I try not to fly on pleasure because I fly too much on business. But the question for reliance standard is. Well, just imagine, let's say you went off on vacation. You think it would be the same stressful experience. For me, I hate flying. So, yes, it would be, to be perfectly honest. But the question for reliance standard and the question for this Court is, under this deferential standard of review, would a reasonable person, not would, could a reasonable person find that the decision of a reliance standard was based on sufficient evidence? And the district court has already said yes. The district court has already said that a reasonable person could agree with reliance standard. That's the end of the inquiry. It depends on where you put your standard, doesn't it? Well, if it's denoted. If you say, oh, well, she's being a vice president is sedentary and she could do sedentary work, the end, is that a reasonable interpretation? If we say she can do sedentary work. Yeah. Her doctors have said she can do sedentary level work. Yeah. She can do sedentary work. And you say, oh, well, being a vice president is sedentary. That is to say sedentary is a question of physical exertion, basically. Yes. So I guess our job is sedentary. And that's it. That's that's the standard, right? No, it's not. You say that's the standard. She can do sedentary work. She's a V.P. V.P. is sedentary. Ergo, she's not disabled. Not entirely. There was a vocational review judge. The vocational review said it said they looked at her actual job based on the dictionary of occupational titles, which a number, of course. And the Ninth Circuit has also suggested that's an appropriate way of doing these things. Well, that troubles me. You know, every other person who works in a bank is a vice president. And so and they have sedentary jobs and their V.P.'s. I guess General Motors has some high level vice presidents, too. If you said to me generically, well, he's a vice president. That's good enough for us. I'm not so sure that sounds like you're using your authority properly. Well, Your Honor, the point on that is that it's her the policy doesn't define disability in terms of her job. It defines it in terms of her occupation. And the Ninth Circuit. So you would say the least stressful vice president's job is what we're talking about. No, no. So vice president of the Orange Julius stand, because instead of calling folks managers, they like to call them V.P.'s. So they call them vice presidents. That's it. No, Your Honor. Because in that case we would look at it and say, no, that's truly a vocational review would say that's truly a managerial position, not a vice president position. The Dictionary of Occupational Titles doesn't look at the least demanding. They look at how it is generally performed in the national economy. And the question on that is, Your Honor, if I may sum this part up. Even such a job as vice president is really sort of a title. Don't you have to look at what her actual job is, what she does, what she did before she had this heart attack? No, Your Honor. Just calling it, you know, we give her the title of vice president, sort of honorific of vice president, and say, well, then you look at everything that's a vice president, it really just bears no relationship to reality. She can't go and be a vice president for an electronics company, let's say. Your Honor, in Ben Dixon, this circuit said that you don't look at her specific job. In that case, the claimant said, I can't do my specific job with my employer. And the court said, no, that's not the relevant inquiry. The inquiry is What was the policy language in Ben Dixon? In Ben Dixon, it was occupation. It was own occupation. Was it? Yes. Maybe one thing to say, you don't look to a particular job, meaning a position that's located in X town and so forth. But her occupation isn't vice president. Nobody ever describes an occupation as vice president. Her occupation is an executive, I think a sales or marketing executive of a technology company. And to try to compare that and what's involved in that job, it may be appropriate to say it's not limited to science tech. But to try to say generically, a vice president is sedentary. End of story. Doesn't that sound a little like a lawyer? There are lots of different kinds of lawyers. Judges, there are lots of different kinds of judges. Are all of them fungible so that any job as a vice president fits her? Not necessarily, Your Honor, but I would point out a few things. One is in Gallagher versus Reliance Steering, the Fourth Circuit had dealt with the case exactly on point. It dealt with a vice president, although he also had some editorial duties, and the court under DeNovo Review said that the review was correct, that there was nothing wrong with the way Reliance Standard evaluated that person's occupation. Well, it didn't stop at the title vice president or the title the person had. It went on to look at the actual description of what an editor does in the printing and publishing industry. And I don't see any sign of that here. Looked at both parts of the job. Is there anything here that indicates the plant administrator looked at what she does in the high technology industry? Your Honor, the problem is there was nothing vocational submitted to us on her side saying my here is a vocational expert who says my occupation involves X. She just said my specific job. And again, we're looking at her occupation. And the term occupation is different than the term job. She can do the vice president job or occupation. Her specific employer gives her some additional requirements that perhaps she can't do, but that's her job, not her occupation. And Ben Dixon says you don't look at it. But the more important part is if Your Honors agree, and I think you have to, that we get discretionary authority, this interpretation has to be followed unless it is unreasonable. Even if her or counsel's interpretation of the term occupation is reasonable, as long as ours is reasonable also, contra pro frentem doesn't apply. It has to be followed. But that means you have to survive on the notion that an occupation of, quote, vice president is reasonable. I think that's the question. Well, not that the occupation of vice president, but that the use of the dictionary of occupational titles to determine the material duties of an occupation is reasonable. And we've cited to the cases that have said it is, even under de novo review. Thank you, Your Honor. You're going to let opposing counsel argue? He might confuse us. I think I did a good job of that, Your Honor. I've heard that he's been known to do that. Have you confused the district judge? I have, but not today, but not in this case. May it please the Court, my name is John Bush, and it's my privilege and honor to represent Damon Wehry and also to be in front of this honorable court. I'm going to start first with where we just ended. I believe counsel made a statement that in this case there's been no evidence of vocational, or vocational evidence as to what Ms. Wehry's did. The Gallagher case reflects that they did exactly what they should have done in referring to the DOT job description. And I think that the argument Reliance advances in this case is reflective of what I see to be the problems, and there's some inherent substance issues that we're not getting to. The Gallagher case, for example, Reliance argued in that case, and the Court found that the regular occupation language as found in this policy means that it's a position of same general character as the insured's previous job. It requires similar training, similar duties. And to that end, Reliance, the insurance company, requires that an employer give an insured, require the employer to give Reliance a description of the job duties. In Gallagher, the entire description that was given to Reliance by the employer said that the vice president job was simply, quote, consistent with such a position. And that's why Reliance went to the DOT vice president in the industry. Well, in this case, on Reliance's own form that is found in the record, they, as part of the information they required when the disability claim was submitted, Reliance had the employer fill out a form that's found in the record in the supplemental record excerpts at page 15, a job analysis. And that job analysis also included the specific job description. And you've got four pages in this case of exactly what Damon Worries was required to do, and it's very detailed. And as the district court found in this case as a matter of fact, it's in the supplemental record excerpts, pages 15 and 16, and then the job description is page 17 and 18. And what the district court found in this case is that the job description for the regular occupation as defined and as requested by Reliance was there was no comparison whatsoever to the DOT job description for a vice president in the industry. And the suggestion that vice president in the industry, which is a sedentary job when you compared it to the job analysis and job description, meant and was found by the district court in this case to reflect that it was not a sedentary job. Who prepared this page 15, 16? The employer, Scion Tech. And as you'll note in the upper right-hand corner, Your Honor, it's a form submitted to the employer by Reliance. And if you follow the Gallagher case and if you follow the Dionata case, which is the district court of Northern District of California, it's this form that Reliance uses to define the term regular occupation because the plan itself does not define that term. And so we're not talking about a sedentary job, number one. And the thing that is particularly troubling, at least to me, is at the time that the benefits were granted, this is how they defined regular occupation. Now that it wants to terminate benefits, it doesn't want to live by its own forms and it doesn't want to live by how that job has been described. What it wants to do is go to the Department of Transportation generic occupation. And that is not only unreasonable, but it's inconsistent with the terms of the plan, which is exactly what the district court in this case found. Now let me turn to the standard of review issue for a minute. And how is it inconsistent with the terms of the plan? Because the way that Reliance is interpreting regular occupation now, when it wants to terminate benefits, is that regular occupation simply means any vice president in the industry. But at the time when it was interpreting regular occupation, it had the forms, which it gave to the employer, and it asked the employer to find out exactly what the job was all about. It asked for a job description so that it could determine later what regular occupation really means, which is can she return to a job that has the same training or similar training, requires similar skills, has similar material duties. And now when they say Department of Transportation generic job description versus what she really did, that's not the same. Let me ask the question again. You said two things. You said it's inconsistent, okay, but also violates the terms of the plan. I understand the inconsistent part. You don't have to go over it one more time to tell me how these things are inconsistent. This time listen, okay? This time listen. We won't waste any more time. Thank you. The question I asked you, how is it violating the terms of the plan? You went back and told me once again why it's inconsistent. I didn't need to demonstrate it to me again. How is it violating the terms of the plan for them to rely on the Department of Labor description? The terms of the plan defines regular occupation. The term of the plan is what is at issue here is is she totally dis- Regular occupation, yes. Right. That's the term of the plan. And if I confuse the court, I apologize. I may have misunderstood the question. Don't confuse me. You answered my question. You repeated part of your earlier statement that didn't need repeating. You didn't answer the part of the statement I was asking you to back up. Ask one more time. What is it in the plan that does not permit the administrative discretion to look at the Department of Labor definition of the occupation that requires them to look at this stuff? What I should have said was that the manner in which they interpreted the plan is inconsistent because they have already identified how they will interpret regular occupation when they have granted benefits. Something can't be inconsistent. Something has to be inconsistent with something else. So what is inconsistent with what? Well, what I'm saying is that the way that they have now terminated benefits is inconsistent with the way that they interpreted the plan at the time that they awarded benefits. And that's the inconsistency because on the one hand- When did they interpret it differently? At the time that they awarded benefits, what they defined as regular occupation was the- She had a heart attack. She wasn't working. She was on her back in the hospital. Of course they awarded benefits. What is it that they did that locked them into some definition of her occupation that is different from using the Department of Labor? What did they say? They said we're using this definition in deciding- Do you have a piece of paper that says this is what we're relying on? No, I don't have a piece of paper. What I have is- Correct. What do you make of that? So they asked the employer to fill out a form. Maybe they asked the employer to fill out a form so they could then go to the Department of Labor and find the closest thing in the book there that would meet the thing. We don't know why this form was filled out, do we? Well, I think that we- Was this form somehow relied on, referenced in any decision that the plan administrator made? Yes or no? Yes. Tell me what it was. The form was relied upon by the claims examiner when it reviewed the case to determine whether or not Ms. Wearies was eligible for benefits in the first place. And you have that documented in what- It is in the supplemental record excerpts at page 23. Okay. 23 is a lot of handwritten stuff. You're going to have to tell me where it is that you are. In those claims examiner notes, they are referencing, as part of the claim facts and also as part of the examiner recommendations, several aspects of the claimant's job, including and specifically the fact that she travels 25 to 30 percent of the time, including the fact that the job description reflects that it is a high-stress job, including the fact that she manages some 300 employees. And the only place where that information could have come from would have been the job analysis and the job description that was provided by Cyantech to Reliance as part of the claims evaluation process. I understand that what you're saying is they awarded her long-term disability benefits. Yes, sir. And they must have awarded them because she met the can't-perform-the-material-duties-of-her-occupation, or else they wouldn't have given them to her in the first place. Of her regular occupation. Correct. They wouldn't have given them to her in the first place. Correct. Ergo, you say, how in the world could that have changed two years later, whatever it was later? In part, yes, sir. In part, I'm also saying is that when they awarded those benefits in the first instance, and the manner in which they awarded those benefits and the evidence that they had to use those benefits also reflects how they interpreted the terms. In other words, when you get to how they defined the term regular occupation, which is undefined in the policy. They defined it to cover what she did to the extent they could award her long-term disability benefits. Yes, sir. You're saying how in the world those didn't change, so how in the world could they decide now she doesn't get them? Now that they're terminating benefits, they're using a different definition. That's exactly what I'm saying. Now, the form that you are pointing to, SRE23, is a form called claims referral. It doesn't look to me like a decision or anything of that sort. What is it actually, and what specifically within that form are you relying on? Again, given that I can't read most of it. The examiner's recommendation says feel concerned. I'm sorry. The examiner's recommendation?  What is the examiner's recommendation? Well, I'm assuming, but I haven't deposed this fellow and I don't know what the internal standards and workings are at Reliance. This thing says claims referral. The language that I am referring to in the interpretation that I am making of this document is that. This is the section called examiner's recommendation. Right. The two heavy lines. Okay. And it says feels condition present and documented precludes claimant from performing own occupation of material duties of same. Then there are some references to her medical condition, which I believe refers to the myocardial infarction, chronic artery disease, or CAD, the 18% injection fraction, which relates to the heart's ability to pump blood. And then he writes stress and demands of vice president duties support TD, which I assume total disability. And then there's a reply that starts with agree with recommendation. Now, shortly after this, the date of this is September 10th, 1998. It's within, I think, weeks of this that Ms. Weary's received a letter from Reliance advising her that she's been approved for her long-term disability application. And it's signed by Glenn and the last name escapes me. But that letter seems to correspond with this analysis. What you are relying on to say, oh, they have adopted this definition is an internal working paper of the company. It's not something where they said, here's your decision. This is our ruling. This is based on this definition of disability. What you're doing is taking working papers. And what you're saying, because in doing these working papers, they have a lot of information on this form. They now get locked into this form for the rest of the proceedings. It's a little strange to me for you to be making that argument. You know, it's not, I mean, a ruling. It's nothing official, nothing they communicated to your clients. This is their internal deliberations. How can that lock them into a particular methodology or particular legal? I think what I'm trying to suggest, and perhaps not very well, is that what Reliance has is an insurance policy in which the key terms of disability, i.e., can you do the material duties of your regular occupation. We are dealing with the term regular occupation, which is undefined. And we have cases that, the Gallagher case and the Dionata case, that specifically state, and also involving Reliance Insurance, by the way, which state that what Reliance has done in the past is they go to the employer to assist or help them define what that term regular occupation means. And it means in part that you're looking for a job that has similar duties, similar skills, so that when you're making the determination, whether it be down the road as to whether or not she's still disabled, you still have to define the term regular occupation. And one of the ways that you look at how Reliance as the fiduciary interpreted the term regular occupation in this case, and I assume with all other cases, is you look at what they actually did. What was the information that they requested? What were the forms that they sent out? What was received? How did they review that? And how did they ultimately reach their decision that she was unable to perform the material duties of her regular occupation? And in this case, it seems very apparent to me that, on the one hand, they determined that she couldn't meet her regular occupation based upon the information that was presented to them. I'm not entirely sure I buy off on that whole analysis. It seems to me that the insurance company can reasonably look, if somebody gets sick, they're obviously not in a position to be pounding the pavement looking for other jobs. So in deciding whether you're going to start benefits, you look at what they were doing before and say, can they go back, can they still do the job they were doing before? They're a sick person, and they either can't do the job or they can't do the job. If you move a little bit later on, and some time has passed, and it's pretty clear that they can't go back to this specific job, you might ask for purposes of permanent disabilities. It's okay. Now they've gotten better. Now they've recovered as much as they're going to recover. And now we're going to see, can they get another job that's sort of like the job that they couldn't do? It's in the same category, but maybe not as tenuous in certain respects. A job that respects the new limitation on their abilities. And the two questions are sort of like being the same one. I don't understand why you maintain that they must, in initiating benefits, they have to be convinced that the person is lying on their back on a gurney, that if they just got up and walked down the street, they could get a similar job that was less stressful. Can't they just be satisfied, look, they can't get up and do any job. They can't do this job. They can't do any job right now. We'll worry a little bit later about whether or not they could go out and get something else. Well, I would agree with everything that you said with this proviso, that when the term is defined, the term is defined. And while somebody may improve, the question then becomes, have they improved to the position where they can go back to their regular occupation? What does regular occupation mean? You can't change what that means. It means the same at the time that she was disabled. The benefit determination was made, and it means the same later. What if the same employee had another vice president's job that was just like this job, except much less travel? You know, instead of being on planes, I don't know, every twice a week the way she was doing, they said we have a job, a management job that happens to be in a region that's close to home, and you can do most of your rounds driving. You wouldn't say that she's disabled from doing her job. Don't know. If they're comparable and they're equal in the definition and the interpretation of the term has all been assigned, so be it. But they all were really dickering over whether or not the job that they said she could get was really comparable. Isn't that where the discretionary standard really kills you? Because if you accept the view that this gives administrative discretionary authority reviewable only for abuse, then the question of the two jobs are exactly the same or close enough becomes almost totally unreviewable. Well, I don't think in this case that we're even to the point on this record where you could say that the two jobs that were being looked at here are even close. I would give to you that if they were close and then you might, and if you're on a purely discretionary issue, you might have that. But go back to the district court's opinion in this case, and it's very clear from the factual findings that he made that in comparing the DOT job description to the actual job description, that there was no comparison. And, in fact, in both Gallagher and Dionato, one of the things, the cases that Reliance lost, and I'm out of time, may I finish, please, that what happened is that Reliance never did compare the jobs, the DOT job to the job description provided by the employer to see if there was some commonality, to see if there was some even ground. And they didn't do that in this case either. How do we know that? Because it's apparent from the denial letters. All they did was, in fact, at one point Reliance said, we understand that you may assert that your actual job is much more physically exerting or much more strenuous than the DOT job, but that doesn't matter. But it does matter. It matters significantly when you look at the case law. Okay. You're out of time. Thank you. Your Honor, do I have any time to briefly respond to two points? I don't know. The clock is not coming up with anything. So you are saved from your own folly. Negative numbers when you start down. Well, then I will sit down. Thank you, Your Honor. I actually think standing up and leaving is probably the better course. Judge Asagi will stand for a minute.
judges: Kozinski, Fernandez, Clifton